[No. 1420.  Decided November 10, 1894.]

B. C. ARMSTRONG ET AL., *Respondents, v.* JOSEPH A. FORD, *Appellant.*

APPEALABLE ORDER—REMOVAL OF RECEIVER—CHATTEL MORT-
GAGE UPON STOCK OF GOODS—LIEN UPON FUTURE ACQUISI-
TIONS OF GOODS.

Where a receiver has been appointed to take charge of a stock of goods pending a proceeding to foreclose a mortgage thereon, an order of the court discharging certain of the goods from his custody is an appealable order under Laws 1893, p. 119, § 1, subd. 5, which provides that " an appeal may be taken from any order appointing or removing, or refusing to appoint or remove, a receiver."

Where a chattel mortgage is given upon a stock of goods providing for the payment of the mortgage indebtedness out of the proceeds of the sale of the goods and the mortgagee enters into possession of the stock for the purpose of controlling the application of the proceeds, the lien of the mortgage will apply to goods subsequently purchased and mingled with the stock for sale, although the mortgage does not in terms cover such after-acquired goods.

A mortgagee will be presumed to have been in possession of mortgaged goods under a mortgage reciting that he is given possession, where the testimony in regard to his possession is conflicting.

*Appeal from Superior Court, Thurston County.*

*Sharpstein & Blattner* and *C. H. Ayer,* for appellant.

*Robinson & Linn,* for respondents.

The opinion of the court was delivered by

DUNBAR, C. J.—This is an appeal from an order of the Superior Court of Thurston County, made on the 2d day of April, 1894, releasing and discharging to respondents certain goods from the custody of the receiver appointed by the court in the action then pending.  The undisputed facts are about as follows:  On the 19th day of March, 1892, the respondents, who were retail merchants in the city of Olympia, were indebted to Murphy, Grant & Co., wholesale dealers in dry goods, in the sum of $10,152, and for the pur-

pose of securing said indebtedness they made, executed and delivered to appellant Joseph A. Ford, for the benefit of said Murphy, Grant & Co., twelve promissory notes each for the sum of $346, payable monthly thereafter, and at the same time made, executed and delivered to appellant a chattel mortgage on their stock of dry goods in the said city of Olympia.

The mortgage provided that the mortgagee should have possession of said chattels, and further provided that in case default should be made in the payment of any of the moneys secured by the mortgage, the mortgage should at once become due and payable, with the provisions common in such mortgages, that in such case the mortgagee might foreclose the same and have the property sold in the manner provided by law, and out of the proceeds of the sale pay the balance of the indebtedness.

It is claimed by the appellant that upon the execution and delivery of the mortgage, he entered into the possession of the mortgaged chattels, by his agent George A. Sheppard, and at the time possession was taken an agreement was entered into between the respondents and the said Sheppard, acting as agent of the appellant, whereby the said Sheppard was to continue the business in which the respondents were engaged, and out of the proceeds of the sales to pay the running expenses of the business, purchase new stock to replenish the old, and out of the surplus to pay the mortgage debt. It is denied by the respondents that Sheppard was the agent of the appellant, or that he entered into possession of the goods and chattels as claimed by the appellant, but of this denial we will speak hereafter.

It is contended by the appellant that in pursuance of this agreement said Sheppard did conduct said business, sell the goods and pay the running expenses, purchase new goods from time to time as they were needed, which were placed with the old stock and sold with it without any separate account being kept, and apply the surplus to the extinguishment of the debt; so that on the 21st day of September, 1893, although all the debt was then due, only about two-

thirds of it had been paid, there being a balance due on said debt of $3023.14, and also about $2500 for running expenses and new goods purchased. On that day the appellant directed the sheriff of Thurston county to foreclose said mortgage and sell the stock in the manner provided by statute, which the sheriff proceeded to do. On the following day the respondents commenced an action in the Superior court of Thrston county, against appellant and against the sheriff of Thurston county, to enjoin the sale of said property. Upon the filing of the complaint the sheriff was restrained from proceeding and directed to show cause why he should not be perpetually restrained from proceeding further. On the 25th day of September, 1893, the respondents moved the court for an order requiring the appellant to transfer his proceedings for the foreclosure of said mortgage into the Superior court. On the same day an order was made accordingly. Upon the hearing of the order to show cause the court made an order restraining the sheriff from interfering with the mortgaged goods and directing him to return the same to respondents. On the 26th day of September, 1893, the court, upon the application of the appellant, appointed a receiver to take possession of the goods during the pendency of the action, and the receiver therein, George A. Mottman, at once took possession of the goods. An order was subsequently made, dismissing the action as to the sheriff, and the cause proceeded against the appellant alone. Subsequently the respondents moved the court for an order to discharge from the custody of the receiver all of the goods belonging to said stock that were not covered by the chattel mortgage. Upon the hearing of this motion the order was made as prayed for, from which order the appeal was taken to this court.

The respondents moved this court for an order dismissing the appeal taken herein, for the reason: (1) that the order appealed from is not an appealable order; and (2) that this court has no jurisdiction to hear and determine said appeal. The second ground is embraced in the first.

It seems to us that this appeal falls within the provision of paragraph 5 of § 1 of the laws of 1893, page 119, which

provides that "an appeal may be taken from any order appointing, or removing, or refusing to appoint or remove, a receiver." It is true that this is not an appeal in one sense from the order of the court removing a receiver, but the result of the order would certainly be the same so far as the rights of the appellant are concerned, as it would make little difference to him practically whether the court discharged the receiver or discharged the goods, the property on which he had a lien, from the possession of the receiver. To hold otherwise would be to destroy the efficacy of the right of appellant given by the statute, and would be an observance of the form, rather than the substance, of the law. The motion to dismiss the appeal will therefore be overruled.

The contention of the respondents in this case is that the appellant, the mortgagee, has no lien upon the goods which were purchased for the purpose of renewing the goods which were sold, and upon which the mortgage was given. That is really the only question to determine in this case.

We will first discuss the proposition without any reference to the question of possession in the mortgagee. There are some old cases which follow the doctrine laid down by Bacon that the subject of a mortgage must have a potential existence, and some of the earlier courts held that a mortgage which undertook to create a lien on property which was not in existence at the time of the execution of the mortgage, and still further that property which was not in the possession of the mortgagor at the time of the execution of the mortgage, was void and would not attach to property that was subsequently obtained or that subsequently came into the possession of the mortgagor. But even in those cases the question always arose between the mortgagee and creditors of the mortgagor, and many of them while deeming that the lien would attach in an equitable proceeding, probably not so much by virtue of the mortgage as by virtue of an agreement between the mortgagor and the mortgagee, yet held that in a legal proceeding no such right exists. The former is in accord with the principle which is often adopted

in equity, viz., to consider a thing done which is agreed to be done.

But none of the cases cited by respondents present such a state of facts as the case at bar, and if they did, the changing conditions of business and the multifarious ramifications of business interests and necessities, growing out of the credit system upon which mercantile business largely depends in this age, compel a more liberal construction and a larger protection of the interests of the mortgagees.

The respondents cite §§ 356 and 361, Cobbey on Chattel Mortgages, in support of the proposition that the mortgage cannot be extended to cover goods purchased subsequent to the execution of the mortgage. Sec. 356 states the general proposition that the instrument to be operative must clearly show the intention to cover after-acquired property. It will be seen that this statement is in exact conflict with some of the old cases cited by respondents, for some of them were decided upon mortgages where it was expressly provided in the mortgage that it should cover after-acquired property. The authority above quoted proceeds :

"When this intention is shown, the mortgage is valid, and will be upheld. The intention of the parties that a mortgage shall take effect upon and include property not then owned by the mortgagor, but to be subsequently acquired by him, must be expressed in the instrument itself in words sufficient to carry their intention into effect, and cannot be shown by extrinsic evidence."

It will be seen, however, by an examination of the cases cited by that author to sustain the text, that the statement is made with reference to the rights of attaching creditors of the mortgagor, and is not intended to apply to cases where the contest is purely between the mortgagor and mortgagee. For instance, one of the cases cited, viz., *Howell v. Francis*, (N. J.) 10 Atl. 436, decides that where a mortgagee took a mortgage for certain goods and chattels with the following provision : "and all and singular the other goods and chattels and effects whatsoever, now in or upon the premises occupied by the within named mortgagors, * * * and

all the fixtures, other goods, chattels and effects whatsoever in our store, * * * or which may during the continuance of the within security be brought into or upon the afore mentioned premises ; '' the mortgage did not cover the horses which were not originally described in the mortgage and which afterwards came into the possession of the mortgagee, but that it did cover horses afterwards obtained by exchange for the horses which were mortgaged ; deciding the very question at issue here, in opposition to respondents' contention. And the case of *Meredith v. Kunze*, 78 Iowa, 111 (42 N. W. 619), cited by Cobbey, *supra*, simply held that the mortgage was invalid as against the interests of third persons having claims against the mortgagee.

Sec. 359 lays down the broad doctrine that "a mortgage of chattels to be hereafter acquired is void. If, however, the after-acquired property is taken by the mortgagee into his possession before the intervention of any right of third persons, he holds it under a valid lien, by the operation of the provision of the mortgage in regard to it." In § 360 the author states that the courts have universally held that such mortgages were valid as between the original parties.

The old cases which followed the maxim of Lord Bacon quoted above, did not take into consideration another maxim enunciated by Lord Bacon that, although the grant of a future interest is invalid, yet a declaration precedent may be made which will take effect on the intervention of some new act. The act which intervened in the case at bar was the purchasing of the goods and substituting them for the goods which had been sold and which were without question subject to appellant's lien. So it will be seen that the citation here is not in harmony with the citation of some of the old cases above referred to ; for in § 361, of Cobbey on Chattel Mortgages, it is announced that a mortgage may by express stipulation be drawn to cover goods put in stock in place of others sold out from time to time. Of course, it is not contended in this case that this stipulation existed in the mortgage. This provision for the express stipulation evi-

dently applies, as did the other provision cited above, to cases where the contest was between the mortgagee and the attaching creditors ; for one of the cases cited to support the text is *Allen v. Goodnow*, 71 Me. 425, where the court says, where the contest was wholly between the original parties, the mortgagors and mortgagees :

"We know no principle of law which prevents the parties from making such a contract; and if honestly executed by the mortgagors by using the proceeds of sales in purchasing other goods which were put into the store to take the place of those sold, the title to such goods is in the mortgagees, precisely the same as if they had made the sales and purchases themselves by the consent of the mortgagors."

And so we say that whether there is an express stipulation to that effect in the mortgage or not, it is a just and logical conclusion that where the mortgaged goods are sold and the proceeds applied to the purchase of new goods the new goods should be substituted for the old and should be subjected to the lien which attached to the original goods. They are in reality the goods of the mortgagee. If the condition is expressed in the mortgage that the goods may be sold and the proceeds applied to the extinguishment of the debt, and by reason of the liberality of the mortgagee the proceeds, instead of being arbitrarily applied to the extinguishment of the debt, are allowed to be applied upon the purchase of other goods for the mutual benefit of the mortgagor and the mortgagee and for the purpose of carrying on the business, it would be an unjust doctrine to hold that the mortgagor should receive the benefit of the money which, under the contract, belonged exclusively to the mortgagee. What difference does it make that it has simply changed its form from money back to goods? The lien was on the goods in the first place; the lien was on the money when the form of the property secured was changed from goods to money, and we are at a loss to know, either on legal or equitable principles, why the lien should be lost when the form was again changed to goods. The spirit of the contract can only be carried out by holding that the lien attaches at all times and under all the different forms and conditions.

Sec. 154 of Jones on Chattel Mortgages, also cited by respondents, states the text as follows :

"The fact that the new goods were acquired by way of renewal of the goods on hand, or in substitution for them, or were paid for out of proceeds of the old, has seemed in a few cases to be the ground upon which the mortgage has been sustained as a lien upon the new goods; yet this ground has been so often declared ineffectual to give the mortgage any validity as to goods subsequently acquired, that no exception to the general rule prevailing at law regarding such mortgages can be sustained."

Thus far the text would seem to sustain respondent's contention, but as with the other authors, it is evident from a further reading that this author is applying this rule only to contests between the mortgagee and attaching creditors, for further on in the same section it is stated that "a mortgage of goods in a store and all renewals and substitutions for the same, the object being to include not only the articles then in the store, but whatever may be at any time therein in the the course of the mortgagor's business, does not convey subsequently acquired goods, so as to give the mortgagee a right of action at law against a creditor or subsequent mortgagee seizing them;" thereby plainly limiting the application of the rule as above announced.

As showing conclusively that this limitation exists in the mind of the author, the same section concludes as follows :

"But as between the mortgagor and the mortgagee, other property may be substituted for that included in the mortgage. Such property, however," says the author, "is not then held by virtue of the mortgage, but by virtue of the agreement of the parties whereby an equitable lien, cognizable only in a court of equity, arises in favor of the mortgagee."

Whether there is any real, practical distinction to be made here, such as the author attempts to express, makes but little difference, for the practical result is the same whether the lien attaches by virtue of the mortgage or by virtue of the agreement. As far back as 2nd Story's Reports, in the cases of *Fletcher v. Morey*, page 555, and *Mitchell v. Winslow*, page 630, Justice Story decided that equity would attach its

jurisdiction wherever the parties by the contract intended to create a positive lien or charge either upon real or upon personal property, whether then owned by the assignor or contractor or not, or any personal property whether it was *in esse* or not; but that it attaches in equity as a lien or charge upon the particular property as soon as the assignor or contractor acquires title thereto against the latter. Some courts in reviewing these cases have insisted that the learned justice made a distinction between cases in equity and cases at law; but certain it is that the doctrine at all events was applied to equity cases, and supports the doctrine contended for by the appellant in the case at bar.

The case of *Hamiltan v. Rogers*, 8 Md. 301, cited by respondents, decides that subsequently acquired goods cannot be subjected to the lien of the mortgagee in an action at law against a creditor who has seized them. *Rose v. Bevan*, 10 Md. 466 (69 Am. Dec. 170), is upon the same proposition. In *People v. Bristol*, 35 Mich. 28, it was held that:

" Under a mortgage contemplating that the stock of goods on hand and all its proceeds shall be bound, though not in terms providing for a lien upon future acquisitions, a strong equity is raised in favor of the mortgagee, as against the future additions; and though that equity would not prevail against a levy made while it was no more than a general equity, yet where by valid and formal agreement or otherwise it had become actually attached to the goods before levy, it would prevail."

So it will be seen that so far as the question is raised in this action, viz: the question between the mortgagor and mortgagee, the case is squarely in point in favor of appellant's contention. To the same effect is *Cameron v. Marvin*, 26 Kan. 612; although the question of confusing the goods is also decided in that case.

In *Abbott v. Goodwin*, 20 Me. 409, it was held that if the mortgagor sold the goods and with the proceeds thereof purchased other goods, these last represent the first, and are substituted for them, and are equally subject to the lien of the mortgagees thereon. So, if the mortgagor exchange the goods mortgaged for other goods, and the mortgagee

choose to ratify it, the goods received in exchange are equally subject to their lien.    This, it seems to us, is the doctrine of right and common sense.

"Under the bill of sale," says the court in that case, "the goods became the property of the plaintiffs, with a right of redemption only in George E. Abbott.    Until he did redeem, by performing the condition, as between them, the plaintiffs had all the rights of ownership, modified by right of possession secured to him, until he made default, with the power of selling the goods, which may be implied from his covenant to account to them for the proceeds of all sales, to be applied to the payment of the debts intended to be secured, or to be so directly applied by him, at the discretion of the plaintiffs.    They authorized sales, and they secured to themselves the power to control the proceeds for the same purposes, for which the goods were mortgaged.    The proceeds were purchased with their property, through his agency, under their authority.    They represented the goods, were substituted for them, and by the contract, were equally subject to their control.    It was manifestly the intention of the parties that the proceeds should be subject to their lien.    If he sold for cash, the money was theirs, so long as it could be identified.    And if with the money received he purchased other property, the property so purchased was theirs, until he extinguished their right, by fulfilling the condition.    So if he exchanged the goods mortgaged, for other goods, and they chose to ratify it, the goods received in exchange were equally subject to their lien."

So we say in this case, the goods were recieved in exchange, for it is virtually an exchange of one lot of goods for another, with the addition of the profits which inured to the benefit of the mortgagor.    The mortgagor certainly has no rightful claim upon this property which was purchased with money upon which he confessedly had no claim.    He assumes to base his right to this property upon the purchase of it with funds upon which he claims no right.    The position is illogical and without foundation in reason or morals.

However, it is not necessary to go to this extent to reverse the judgment in this case, for under all the authorities excepting the few old cases which we have above mentioned, which laid down the principle that a mortgage upon property which was not at the time of its execution in the possession

of the mortgagor, was void, it is held that where possession is given the mortgagee, the subsequently acquired property from the products of the mortgaged property becomes subject to the lien ; and a careful investigation of the record in this case satisfies us that the possession of this property from the day that the mortgage was executed up to the time it was taken into the possession of the receiver was in Sheppard, the agent of the appellant.

The affidavit of Sheppard is in brief to the effect that, not being able by reason of his business to take personal possession of these goods, he agreed with the respondents that his interests should be represented by one Miss Magill, whom he hired to take the place of a clerk who was then in the employ of Armstrong Brothers ; and the agreed duty of Miss Magill was that of saleswoman on the same footing with B. C. Armstrong, and that her further duty was to represent Sheppard, to take charge of all moneys accruing from the sale of the goods, deposit the same in the bank to Sheppard's credit, and to order other goods in lieu of those sold, when it became necessary to supply them for the purpose of keeping up the stock and insuring the proper conduct of the business. The affidavit further shows that for several months Miss Magill performed the duties allotted to her to the satisfaction of Sheppard, but finally affiant became suspicious that she was colluding in his absence with Armstrong Brothers, and was failing to properly represent him. Hence his action in attempting to foreclose his lien.

The affidavit of B. C. Armstrong, while it contradicts the affidavit of Sheppard in some minor particulars, does not seem to us to contradict it on the material points involved here. It is admitted by him that Miss Magill was employed by Sheppard and sent to them at the place of business, as stated in Sheppard's affidavit, but it is denied that she represented Sheppard's interest any more than theirs, but that she was employed simply because she could be obtained for a smaller salary than the clerk whom they discharged and whose place she filled. It is admitted, however, that Miss Magill was clothed with extraordinary powers, not such

powers as are ordinarily given to a mere clerk; that the power of ordering goods and of disposing of funds from the sales of goods was taken out of the hands of Armstrong, and that the agreement was that the cash for all sales made should pass through the hands of Miss Magill, and out of the same the expenses of running the said store should be paid; that she should turn over to Armstrong enough to support him while conducting the said business, and that she should deposit the balance in the bank to the credit of Sheppard as agent aforesaid. It is true that the affidavit goes on to state that the said Miss Magill never had the charge and control of the said stock of goods, but this is a mere conclusion which is not borne out by the facts above stated. It is also admitted in this affidavit that Miss Magill ordered goods in the name of Sheppard, agent, but it is asserted that it was always done under the advice and direction of affiant or his brother. This is not at all inconsistent with the theory of control by Miss Magill, for even it she was the absolute owner she naturally would take advice concerning the purchase of goods from men who had had experience in the same business and in the same place. The affidavit of Armstrong also admits that it was the agreement that the business should be carried on in the name of Sheppard. It asserts, however, that it was not understood or agreed between them whether the said Sheppard was acting as the agent of Ford, the appellant in this action, or Armstrong Brothers, the respondents, but that it was understood that he should handle all the proceeds from the sale of said stock of goods, and should cause the same to be applied upon the payment of the debts, to secure which the said mortgage was given. It seems to us again in this instance, that the authority with which Sheppard was clothed must necessarily force the conclusion that he was acting as the agent of the appellant instead of the agent of the respondents, and that the assertion of Armstrong that it was not understood and agreed between them whom Sheppard should represent, is an assertion that is not borne out by the facts as set forth in his own affidavit; or, in other words,

he states facts which constitute Sheppard the agent of Ford as a conclusion of law.

The affidavit of Miss Magill is not of much consequence, and, outside of the denial of the act of collusion, it rather supports than contradicts the affidavit of Sheppard.

In the absence of very strong proof to the contrary, it will be presumed that the provisions incorporated in a written agreement will be carried out, and the testimony of the contending parties with reference to the possession of these goods must be construed, and their credibility determined, somewhat with reference to the written agreement. In this mortgage it is especially stipulated that the mortgagee "shall have possession and is hereby given possession of such personal property," referring, of course, to the mortgaged property. The natural presumption is, in the absence of testimony, that the mortgagee was given possession of this property in conformity with the stipulation; and it would take very strong testimony to rebut this presumption, and if the testimony were equal the court would be warranted in coming to the conclusion that the contention which corresponded with the conditions of the written agreement was the correct one, rather than the contention which disputed the written conditions.

In addition to this, all the circumstances surrounding the case go to show us beyond any doubt that it was understood that the possession was in the appellant; that he made himself responsible for the expenses incurred in running the business; that the several thousand dollars worth of goods ordered to take the place of goods that were sold were consigned to him. This is shown by the testimony of Mr. Horr, who was acting in the capacity of wharfinger in Olympia at the time these goods were received, and by the testimony of merchants of whom these goods were purchased and who testified that they were delivered in the name of and upon the credit of George A. Sheppard ; that he continually represented himself to Horr and to these merchants aforesaid and to the world at large as possessing and being responsible for these goods ; that he actually is

responsible for them.   And such testimony as this cannot be overcome by the mere statement of a conclusion by respondents that it was not understood that the goods were in the possession of Sheppard.   Their understanding will be held to be controlled by the facts of the case.

In our judgment the testimony is so overwhelming that we do not hesitate to reverse the case.   The judgment is, therefore, reversed and the cause remanded with instructions to proceed in accordance with this opinion.

ANDERS, HOYT, SCOTT and STILES, JJ., concur.